UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas Anthony AVARELLO, Jerry Henry Wood, Carmel Cosmo Bowers, James Eugene Avery and Bobby Joe Chapman, Defendants-Appellants.

No. 78–5044.

United States Court of Appeals,
Fifth Circuit.

April 13, 1979.

Rehearings Denied May 29, 1979.

Wm. H. White, H. Wayne Gillies, Houston, Tex., for Avarello.

William M. Ravkind, Dallas, Tex., for Wood.

Jerry W. Melton, Dallas, Tex., for Bowers.

Jack Paul Leon, San Antonio, Tex., for Avery.

Warren Burnett, Richard J. Clarkson, Odessa, Tex., for Chapman.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Shirley Baccus-Lobel, Alvin H. Badger, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before INGRAHAM, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

Pursuant to a court order, the FBI began intercepting telephone conversations of appellant Jerry Wood, a Dallas bookmaker. The interception, which continued from November 27, 1975, to December 9, 1975, and which produced recordings of more 1,100 calls, resulted in indictments against Wood, Virginia Avanell Smith, Bobby Joe Chapman, Thomas Anthony Avarello, James Eugene Avery, and Carmel Cosmo Bowers[1] for conducting an illegal gambling business, in violation of 18 U.S.C. §§ 1955[2] and 2. Following a jury trial, all defendants were convicted. We affirm the convictions.

The major question at trial and on appeal is whether there was one gambling business, involving five or more persons, as required by section 1955. Before addressing this issue, however, we shall discuss the numerous other alleged errors raised by appellants.

### The Facts

Appellant Wood was an admitted bookmaker who operated in Dallas. At the

---

1. Also indicted were Benny Wayne Campo, whose case was severed prior to trial, and Dorothy Croucher Brannum, who was dismissed from the case on the motion of the government. Virginia Smith died before trial.

2. 18 U.S.C. § 1955 provides in relevant part:
   (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
   (b) As used in this section—
   (1) "illegal gambling business" means a gambling business which—

   (i) is a violation of the law of a State or political subdivision in which it is conducted;
   (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
   (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
   (2) "gambling" includes but is not limited to pool-selling, book-making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

same time, appellant Chapman was engaged in a bookmaking operation in Dallas, and appellant Avery was running a similar operation in Amarillo. The operations were conducted primarily over the telephone, and the recorded conversations revealed wagers on various sporting events, mainly college and professional football games. The government presented the bulk of its case by playing the tape-recorded conversations, identifying the voices involved, and then having an FBI expert explain both the gamblers' jargon and the significance of the conversations in the context of gambling. Also produced at trial were individuals who had placed bets with Avery, Chapman, and Wood.

The government's evidence tended to show that appellant Wood, in addition to taking bets directly from bettors over the phone, used appellants Avarello and Bowers to disseminate gambling information to bettors and to relay bets to him.[3] The wiretaps revealed that Virginia Smith, who worked as a bartender for Wood, relayed bets to him and settled up with gambling customers on his behalf. Government evidence tended to show that Wood conveyed line information[4] to appellant Avery and accepted bets from him, which were characterized by the FBI expert witness as layoff bets.[5] The tapes also tended to show that Wood and Chapman regularly discussed the halftime line;[6] Chapman gave Wood the halftime line on a number of occasions, and Wood laid off halftime bets with Chapman. The government's theory was that the five appellants and Smith could be linked together as one illegal gambling business, and the jury, by its verdict, agreed.

### Wiretap Evidence

Appellants attack the government affidavit submitted to the district court pursuant to 18 U.S.C. § 2518 and the resultant order authorizing a wiretap. They assert the affidavit was insufficient and the wiretap evidence illegally introduced for four reasons: (1) the affidavit failed to show probable cause; (2) the affidavit (and order) failed to set forth properly that a state statute was being violated because they miscited a repealed state statute; (3) the affidavit failed to demonstrate that normal investigative procedures were inadequate; and (4) the affidavit contained misrepresentations. Because the order authorizing the wiretap is the same one we upheld in *United States v. Clements*, 588 F.2d 1030 (5th Cir. 1979), we affirm the trial

3. Persons who perform this function are termed "writers." They are agents of the bookmaker who accept, or perhaps solicit, bets on behalf of the bookmaker and funnel them to him.

4. This information concerns the "line" or "point spread" for each game on which the gambler is accepting bets and includes the favored team and the number of points by which it is favored. The betting line is designed to attract an approximately equal amount of betting on each side of the contest. For a discussion of the importance of line information to a bookmaking operation, see *United States v. McCoy*, 539 F.2d 1050, 1059–60 (5th Cir. 1976).

5. As we have discussed many times in our previous cases, layoff betting is the principal method by which a gambler balances his book. A professional gambler makes his profit, not by "winning," but by collecting a built-in ten percent profit, called "juice" or "vigorish" that losing bettors are required to pay. When a bookmaker receives more bets on one side of the line than the other, he will seek to "lay off" the excess dollars bet on the more popular side of the line by placing a bet in that amount, usually with another bookmaker. In the best of all possible gambling worlds, a bookmaker will have his book perfectly balanced—i. e., the same amount bet on each side of the line—so that he will collect 110% of the amount he must pay out, no matter which team beats the point spread.

6. Halftime wagering is a specialized form of betting activity, which involves greater risk and profit than ordinary wagering. Halftime bets are made on the second half of televised contests and then only if the score of the game warrants further gambling activity. The line must be set quickly by the bookmaker and is thus far more subjective than the regular line, but losing halftime bettors pay twenty percent "juice" to the bookmaker.

court's denial of the motion to suppress the wiretap evidence.[7]

### Search Warrant Evidence

Appellant Avarello asserts that evidence obtained in a search of his residence should have been suppressed by the lower court because the body of the warrant incorrectly stated his address as Dallas, rather than Fort Worth.

An error in the description of a premises to be searched is not automatically fatal to the validity of a search warrant. We have upheld a search where the wrong numerical address was given, *United States v. Melancon*, 462 F.2d 82, 94 (5th Cir.), *cert. denied*, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972), and where the wrong street address was given, *United States v. Darensbourg*, 520 F.2d 985, 988 (5th Cir. 1975). Here the wrong city was specified, which was certainly a potentially more serious error. Our test in this area is that the search warrant description must be sufficient to enable the executing officer to locate and identify the place to be searched with reasonable effort and without reasonable probability that another premises might mistakenly be searched. *United States v.*

*Prout*, 526 F.2d 380, 387–88 (5th Cir.), *cert. denied*, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976). In the instant case, the premises to be searched was listed correctly as 5658 East Lancaster, Apartment 29, Fort Worth, Texas, in the captions of both the search warrant and the search warrant affidavit of probable cause. Only in the body of the warrant was the city mistakenly listed as Dallas; the street address and apartment number were specified correctly in all documents. Moreover, in the body of both the warrant and the affidavit, a detailed description[8] of the apartment building was set out.

Therefore, on the facts of this case we are able to conclude that the executing officers could locate and identify the premises to be searched with reasonable effort. The thorough physical descriptions of the building and of the individual apartment, when coupled with the accurate description of its street location and the apartment's relationship to the neighboring building, foreclosed the likelihood that a Dallas location would be mistakenly searched because of the single incorrect specification. We affirm the denial of the motion to suppress.

7. We need add only that the part of the affidavit that set forth the information about Jerry Wood provided an adequate basis for reliance upon the information supplied by a confidential informant. The affidavit indicated that the informant learned that a Dallas bookmaker named Mike Miller received his football line from a source in Philadelphia and that Miller furnished this line to Chapman and Wood. This information was based on personal conversation with Miller. He later told the informant that he was "bankrolling" Wood's bookmaking operation because Wood was heavily in debt to him, and he thought that keeping him in business was his only hope to be repaid. In personal conversations during the next three weeks, Miller told the informant he was continuing to finance Wood's operation. The informant also provided the phone number for Wood's bookmaking business and related that he had discussed line information with Wood by calling that number. The affidavit also indicated that Wood had been arrested three times previously for gambling violations and that a 1971 court-authorized wiretap resulted in interception of conversations concerning illegal gambling activities. The affidavit included an explicit claim of past reliability. The detailed

information in the affidavit was sufficient to enable the court to test the reliability of the informant and of the information showing probable cause to believe that an offense was being committed. *United States v. Harris*, 403 U.S. 573, 579–80, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *United States v. Clements, supra; United States v. Tucker*, 526 F.2d 279, 281 (5th Cir.), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976).

8. 5658 East Lancaster, Apartment 29, Dallas, Texas, is described as a two story apartment building of tan brick and stone construction located approximately 150 yards south of East Lancaster at the intersection of East Lancaster and Weiler Boulevard. The name Whispering Oaks and the numbers 5658 are located on the north side of the apartment building. Apartment 29 is located in one of the buildings in the apartment complex, south of the office to the apartment complex. Apartment 29 is located on the second story of the building. The door is yellow in color with an aluminum storm door attached. The numbers 29 appear to right of the door and are gold in color. A door bell is located directly below the numbers 29.

### Constitutionality of Section 1955

Appellant Avarello mounts various futile assaults on the constitutionality of section 1955. The statute is not unconstitutionally vague, *United States v. McCoy*, 539 F.2d 1050 (5th Cir. 1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977), is not a violation of the tenth amendment, *United States v. Harris*, 460 F.2d 1041 (5th Cir.), *cert. denied*, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972), does not exceed Congress' power to legislate under the commerce clause, *id.*, and is not unconstitutional because it incorporates state law, *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976); *see United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958).

### Motions for Severance and Mistrial

Appellants Avarello, Avery, Bowers, and Chapman contend that the trial court committed reversible error by denying their numerous motions for severance or for a mistrial. The motions were based on the conduct of Wood's attorney, who they claim prejudiced them by his actions so as to deprive them of a fair trial. They claim that the trial strategy employed by Wood's counsel resulted in inadmissible and prejudicial matter being placed before the jury. The opening statement made by Wood's counsel is the primary target of their complaints, but they attack his performance throughout the trial, as well.

We begin our consideration of this alleged error by reciting a familiar principle: persons properly indicted together ordinarily should be tried together. *United States v. Bolts*, 558 F.2d 316, 322 (5th Cir.), *cert. denied*, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977); *United States v. Morrow*, 537 F.2d 120, 136 (5th Cir. 1976), *cert. denied*, 430 U.S 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). Rule 14 [9] of the Federal Rules of Criminal Procedure is an exception to the general rule. The decision whether to sever the cases of individual defendants for separate trials is committed to the sound discretion of the trial judge. *United States v. Crockett*, 514 F.2d 64, 70 (5th Cir. 1975). Appellants have a heavy burden to show that prejudice resulted from the joint trial. *United States v. Morrow, supra; United States v. Perez*, 489 F.2d 51, 65 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). We require the prejudice to be of the most compelling sort against which the trial court would be unable to afford protection. *United States v. Perez, supra; Tillman v. United States*, 406 F.2d 930, 935 (5th Cir.), *vacated on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). The decision to grant or to deny a motion for severance should be reversed only if the lower court committed an abuse of discretion. *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir. 1978); *United States v. McLaurin*, 557 F.2d 1064, 1075 (5th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978).

Appellants have failed to demonstrate that compelling prejudice resulted from their being tried with Wood. We have read carefully the entire transcript, and we are convinced that, with the exception of the conduct described below, the actions of Wood's attorney were consistent with the defenses advanced by each of his codefendants. Wood's counsel pursued the only avenue of defense open to him—he contended vigorously that, although his client was a bookmaker, he did not operate a gambling business involving five or more persons, as the federal gambling statute requires for conviction. His trial strategy was to ridicule, sometimes to the point of being flippant, the government's theory that Wood had a network of writers and regularly laid off bets. Wood's attorney portrayed his client as a rather hapless and unsuccessful, but independent, bookmaker. Because the wiretap evidence was very damaging to all appellants, Wood's attorney

---

9. Rule 14, Fed.R.Crim.P., provides in relevant part:

   If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

tried to explain the relationships revealed by the tapes in a manner that would exclude them all from section 1955. Thus, he described Avarello as a heavy bettor (to explain the volume of bets shown by the tapes), Bowers as Wood's ex-partner whose only relationship with Wood during the indictment period was as a bettor, and Avery and Chapman as bookmakers who exchanged no more than shop talk and an occasional personal bet with Wood. This basic strategy was continued throughout the trial by Wood's counsel. We think it significant that counsel for Wood's codefendants used virtually the same characterizations of their own clients and argued the same defense as that advanced by Wood. Therefore, appellants' claims of prejudice on appeal are unconvincing.

A more colorable claim of prejudice is raised by appellant Bowers and is based on a comment in the opening statement made by Wood's attorney. Apparently seeking to bolster his theory that Wood and Bowers had ended their business relationship before the indictment period, Wood's attorney referred to Bowers' prior state conviction and probation, which resulted in termination of their partnership. Clearly this remark by counsel cannot be condoned. Evidence of a prior crime is admissible only for limited purposes. Fed. R.Evid. 404(b), 609. *See United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc). The danger inherent in evidence of prior convictions is that juries may convict a defendant because he is a "bad man" rather than because evidence of the crime of which he is charged has proved him guilty. *See Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948), and authorities cited therein. On the facts of this case, however, we do not think that counsel's thoughtless remark in his opening statement, although highly im-

proper, caused compelling prejudice. No objection was made to this remark by any appellant until the next day; then appellant Chapman unsuccessfully moved for severance or a mistrial and all other defendants joined in the motions. The trial court offered to instruct the jury to disregard the remark, but Bowers declined the instruction. Later, at the end of the trial, the court again offered to instruct the jury to disregard the comment if counsel wanted him to do so. The matter was not mentioned again, and no appellant objected to the omission of such an instruction in the final charge. The jury was instructed twice that statements by counsel are not evidence.

An instruction to disregard the comment, offered by the trial judge but refused, would have cured the error. *See United States v. Klein*, 546 F.2d 1259, 1263 (5th Cir. 1977). Moreover, we cannot say that the obvious impropriety had a substantial impact on the jury's verdict against Bowers. *E. g., United States v. Klein, supra; United States v. Constant*, 501 F.2d 1284, 1287–89 (5th Cir. 1974), *cert. denied*, 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975). The taped conversations to which Bowers was a party, as we shall explain below, presented undeniable proof that Bowers was relaying the bets of others to Wood. Thus, the general reference to "a misdemeanor or a felony offense" made by Wood's counsel in his opening statement, though clearly misconduct, could have had only scant impact, if any, on the subsequent verdict. Nor was this error sufficient to warrant a severance or mistrial for Bowers' codefendants. *E. g., United States v. Perez*, 489 F.2d at 67.

No abuse of discretion was committed in denying the motions for severance and mistrial.[10]

---

**10.** Appellants argue generally that severance was required because of prejudice caused by the spillover effect of evidence admissible only against other codefendants. This claim is without merit. The court carefully instructed the jury that the evidence was to be considered separately against each defendant. Precise instructions, such as were given here, see note 14 *infra*, are the best safeguard against the danger that the jury might cumulate the evidence, *United States v. Morrow*, 537 F.2d at 136–37, and appellants have failed to establish prejudice that is beyond the curative powers of these instructions.

## Instructions

Each appellant, except Wood, challenges the instructions given by the trial court to the jury. All complaints are without merit.

Avery, Bowers, and Chapman complain of the adequacy of the instructions regarding the degree of gambling activity necessary to include a defendant within the scope of section 1955. Specifically, they contend that the jury was allowed to convict upon a showing of only an occasional exchange of line information or layoff betting. Bowers also apparently asserts that layoff betting was not defined at all. On the contrary, the charge fully and thoroughly set out the law of this circuit for section 1955 gambling cases.[11] The trial judge carefully instructed the jury that occasional cooperation between bookmakers would not bring them within the statute. Layoff betting was accurately defined in terms of the occupation and purpose of the person making the bet. The charge emphasized that mere bettors were not to be convicted. The term "conduct" as defined by the court adequately reflects the law of this circuit. The charge correctly placed the burden of proof and the reasonable doubt standard was expressed properly, both in the court's general instructions and in its specific instructions on the elements to be proved. Any challenge to the adequa-

11. The jury was instructed in pertinent part:

A bookmaker may take wagers on both teams in a sporting event. When a bookmaker gets too much action on one side of a sporting event, in an effort to balance his books he may "lay-off" the excess action by betting on the team favored by his customers. A bookmaker may direct his customers' bets to a bookmaker who can use the action on that side of the line by making a bet with him, or may direct his customers' bets to any other gamblers interested in taking the good side of the prevailing odds associated with the bet. A "lay-off" bet, thus, should be defined solely in relation to the occupation of and the purpose of the person making the bet—the occupation and motives of the person accepting the bet are irrelevant to the definition.

I have said that a mere customer or bettor cannot be said to conduct or finance a gambling business which he patronized. If, however, you find beyond a reasonable doubt that a defendant is a bookmaker and that he regularly places with or accepts lay-off bets from another bookmaker, you may consider that defendant and the other bookmaker as being members of the same gambling business.

Line information may also be exchanged between bookmakers and the exchange of line information may well be reasonably necessary to a gambling business and the well-being of all bookmakers in a locality. Not everyone who receives from or transmits to a bookmaker line information can be said to conduct the business of the bookmaker. A bettor might casually report to one bookmaker what line is being offered by another; and, a bettor might receive a line from a bookmaker before placing a bet.

If, however, you find beyond a reasonable doubt that a defendant is a bookmaker and that he regularly exchanges line information with another bookmaker, you may find the defendant and the other bookmaker as being members of the same gambling business. Also, if you find beyond a reasonable doubt that a defendant is a bookmaker and that he transmits line information to, or receives line information from, another bookmaker, and that such conduct substantially affects the business of the defendant bookmaker, then you may find the other bookmaker as being a member of the defendant's bookmaking business.

In the exchange of line information and the placing and accepting of lay-off bets the regularity of the conduct involved or the substantial effect that the conduct has on the gambling business is the critical consideration in determining whether another bookmaker is a member of a defendant bookmaker's gambling business. Isolated and casual lay-off bets or an occasional exchange of line information which does not substantially affect the gambling business is not sufficient to establish that one bookmaker is conducting or financing the business of another bookmaker. It is only when there is a consistent and regular pattern of exchanging line information or when the transmission or receipt of line information substantially affects the business of the defendant bookmaker that one bookmaker can be said to be conducting or financing the gambling business of another bookmaker. Also, it is only when there is a consistent and regular pattern of accepting or placing lay-off bets between bookmakers that one bookmaker can be said to conduct or finance the business of the other bookmaker.

Again, a person cannot be found to "conduct" a gambling business unless it is proven beyond a reasonable doubt that the exchange of line information and/or the laying off of bets was reasonably necessary to or an integral part of the gambling business.

cy of these instructions must fail. *See United States v. Clements, supra.*

■ Bowers and Avarello argue that the court erred by failing to define "agent" for the jury. Because they were convicted of being agents of Wood's gambling business, they insist they were entitled to submit to the jury instructions and definitions concerning agency. This contention, too, must fail. This concept was presented to the jury by the definition of "one who conducts" a gambling business. The court instructed the jury that "anyone who performs a necessary and integral function in the operation of a gambling business regardless of how minor the role" may be included as one who conducts a gambling business. The court went on to charge that this is so regardless of "whether or not they be labelled agents, runners, independent contractors or the like." This instruction was followed by an explanation that "one who furnishes line information, acts as a bookkeeper, settles-up bets, accepts a bet, provides a location for accepting or settling-up bets, if such function is necessary and integral in the operation of a gambling business . . . is included as one who conducts such gambling business." The

court concluded by instructing the jury that a mere customer or bettor does not conduct the business. This thorough set of instructions presented completely the "mere bettor" defense of Avarello and Bowers; their proposed instructions defining "agency" in the context of illegal gambling were superfluous and were properly refused.

■ The court also was correct in refusing appellants' requested circumstantial evidence instruction. Where, as here, the jury receives an adequate instruction on the reasonable doubt standard, an additional instruction on circumstantial evidence is unnecessary. *United States v. Clements, supra; United States v. Stokes,* 471 F.2d 1318 (5th Cir. 1973).

■ Bowers complains about the court's instruction concerning the purpose of Texas Penal Code Ann. § 47.03 (1974).[12] We approved an identical instruction in *United States v. Clements, supra,* and do so here.

■ Finally, Avery contends that the court erred in failing to give an *Apollo*-type [13] instruction during the trial. At his request the court included this instruction in the final charge.[14] Because no hearsay

---

**12.** He also contends that no instruction on § 47.03 should have been submitted at all because the government offered no evidence of a violation of state law and failed to get the trial court to take judicial notice of the statute. We rejected identical contentions in *United States v. Clements, supra,* and do so again for the reasons stated in that opinion.

**13.** *United States v. Apollo,* 476 F.2d 156 (5th Cir. 1973).

**14.** It is your duty to give separate, personal consideration to the case of each individual defendant. When you do so, you should analyze what the evidence in the case shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case determined from evidence as to his own acts and statements and conduct, and any other evidence in the case which may be applicable to him.

You have been instructed that it is your duty to give separate, personal consideration to the case of each individual defendant.

You are further instructed now that each defendant must be connected by virtue of his own acts with a gambling business, as that term is used in this charge. However, if you find that five or more persons have knowingly associated themselves together to operate a gambling business as charged in the indictment, with the intent to operate such a gambling business, there arises from the very act of knowingly associating themselves together with such intent a kind of partnership in which every member becomes an agent of every other member. So, where the evidence in the case shows a common plan or arrangement beyond a reasonable doubt, evidence as to an act knowingly done or a statement knowingly made by one such person, while the common act or arrangement is continuing, and in furtherance of some object or purpose thereof, is admissible against all. But, if the evidence in the case does not show beyond a reasonable doubt that a defendant knowingly associated himself with a gambling business, the statements and acts knowingly made by other defendants cannot be used against the defendant that you have found not to be knowingly associated with the gambling business.

evidence linked Avery to Wood's gambling business, we fail to see why an *Apollo* instruction was warranted during the trial, and no error was committed in declining Avery's request.

### Sufficiency of the Evidence

Each appellant challenges the sufficiency of the evidence to support his conviction. The thrust of these arguments is that although Wood was a bookmaker, the others cannot be linked to his business for purposes of section 1955. Because that statute requires a business made up of five or more persons, if the evidence is insufficient with regard to two [15] of the charged persons, the entire case must be reversed. Before we examine the evidence against each,[16] we shall review briefly the principles applicable to this section 1955 case.

Gambling operations prohibited by 18 U.S.C. § 1955 must involve "five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business . . . ." 18 U.S.C. § 1955(b)(1)(ii). It is well settled in this circuit and elsewhere that the scope of the statute includes all those who participate in the operation of an illegal gambling business, except customers or mere bettors, regardless of how minor their roles. *E. g., United States v. Sanabria*, 437 U.S. 54, 70, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43, 58 n. 26 (1978); *United States v. Boyd*, 566 F.2d 929, 934–35 (5th Cir. 1978); *United States v. Joseph*, 519 F.2d 1068, 1071–72 (5th Cir.), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1975). Thus, persons who perform a necessary function in the operation of illegal gambling—whether they be labelled writers, agents, runners, watchmen, telephone clerks, collectors, or subbookmakers—"conduct an illegal gambling business." Only mere bettors are excluded from the reach of section 1955. *E. g., United States v. Boyd, supra*.

The law in this circuit is equally settled that two seemingly independent bookmaking operations can be viewed as one business to achieve the statutory requirement of five or more persons. We require a pattern of interdependence. The rationale is that when one bookmaking operation deals with another and the cooperation is an essential ingredient in the success of the two businesses, they may be treated as one for purposes of section 1955. Thus, we have combined two gambling operations into one whenever the evidence shows a regular exchange of line information and layoff bets. *E. g., United States v. Clements, supra; United States v. McCoy, supra; United States v. Joseph, supra*. We have recognized, however, that occasional or isolated activity between bookmakers may not be sufficient to connect two independent operations. Exchange of line information alone can be a sufficient link to permit combining bookmakers to achieve the jurisdictional five persons, but it must be of such scope as to substantially affect the bookmaker's business, *United States v. McCoy, supra*, or it must be part of a constant exchange between the two, *United States v. Milton*, 555 F.2d 1198 (5th Cir. 1977). We have refused to include a person who was an occasional layoff bettor because that evidence was not inconsistent with the hypothesis that he was a mere bettor. *United States v. Box*, 530 F.2d 1258 (5th

---

**15.** The jury was allowed to consider only six persons to determine whether five or more participated in Wood's gambling business—the five appellants and Virginia Smith, who died before trial.

**16.** We must, of course, view the evidence in the light most favorable to the verdict of guilt. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We must accept all reasonable inferences that tend to support the jury verdict, and any conflicts in the evidence must be resolved in favor of it. *United States v. Warner,* 441 F.2d 821 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). We shall affirm the verdict unless reasonable minds could not conclude that the evidence is inconsistent with the hypothesis of innocence. *United States v. Squella-Avendano,* 478 F.2d 433 (5th Cir. 1973).

Cir. 1976). But a regular exchange of lay-off bets between bookmakers [17] enables us to treat the two as one section 1955 gambling business. *United States v. Milton, supra; United States v. Alfonso,* 552 F.2d 605 (5th Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977). Finally, the "exchange" our cases discuss does not have to be a technical one; it is sufficient that two bookmakers may be linked even though one only gives line information but does not receive it, and the other only places layoff bets but does not accept them. *United States v. Clements, supra.*

With these principles in mind, we turn to the evidence against these appellants. Wood was an admitted bookmaker. The intercepted calls to which Avarello was a party established that he was more than a mere bettor. Avarello asked for instructions from Wood about setting the halftime line and called in a number of wagers to the Wood book; some were clearly for other persons. On one occasion Avarello relayed to Wood a customer's desire to place a $10,000 halftime bet. Wood initially told Avarello to accept only a $5,000 bet [18] but later, acting on instructions from Wood, Avarello contacted the customer and relayed an additional bet to Wood. On another occasion Wood told Avarello to generate some business, saying, "Tell them to hit it a [expletive deleted] lick. I'm hot. I want to play." A few minutes later, Avarello phoned in a $3,000 bet. On yet another occasion, Wood gave Avarello the halftime line and said, "Tell them [happily, unintelligible] let's play." Shortly thereafter, Avarello called in a bet at the line previously quoted to him. Finally, Avarello, in still another call, relayed two bets to Wood and assured him that there would be more. The FBI expert testified that the relationship evidenced by the series of calls between Wood and Avarello indicated that Avarello was more than a customer. We think the evidence easily sufficient for the jury to conclude with reason that Avarello participated in Wood's gambling business by relaying the bets of others.

Similarly, recorded conversations revealed that Bowers, on a number of occasions, relayed potential wagers to Wood, which Wood either accepted or rejected as he needed them. Many of the bets came from someone identified only as "the Mexican"; others were from unidentified persons. Whether "the Mexican" was another bookmaker or merely a bettor, the inference is inevitable that Bowers was relaying available bets to Wood so that he could accept them when his book needed balancing or reject them, at his option.[19] Bowers repeatedly advised Wood to take only what he needed and to call him back when or if he needed more bets. Wood and Bowers discussed settle-up figures for various persons, and Bowers reminded him that he owed Bowers "100 for 101."[20] Wood also described in some detail the financial activity of the book during the past week. The expert witness characterized Bowers as an agent for Wood who accepted bets and funneled them to him, and the evidence supports this characterization. Bowers and Avarello were well within the ambit of section 1955. *See United States v. Masson,* 582 F.2d 961 (5th Cir. 1978); *United States v. Milton, supra.*

**17.** In *Box* a nonbookmaker accepted layoff bets, but we refused to include him as one of the jurisdictional five persons because of insufficient proof that the bets characterized as layoffs were part of a regular course of conduct. We went on to set out the factors required to convict one who accepts layoff bets from a bookmaker. 530 F.2d at 1266–67.

**18.** During this conversation Wood instructed Avarello that he would continue to accept smaller bets, but he did not want the entire $10,000 being offered.

**19.** As *United States v. Box, supra,* makes clear, a nonbookmaker can also accept layoff bets. So whether or not "the Mexican" was a bookmaker, Bowers was providing Wood a source with whom Wood could lay off excess wagering.

**20.** The number 101 apparently designated a bettor who had placed a bet through Bowers, and the expert witness so testified.

Virginia Smith also can be included as one of the five or more persons required for conviction. Conversations between her and Wood revealed that she both relayed bets to him and settled up with customers on his behalf. Unquestionably she performed a function necessary to Wood's operation.

Bobby Chapman was also a Dallas bookmaker; his defense was that he and his partner, on the advice of counsel, ran their local gambling business in such a way to avoid conduct prohibited by section 1955. The crux of his argument is that the government failed to prove a regular exchange of line information or layoff bets as required by our cases. Yet the tapes show that Wood consistently asked Chapman for advice on setting the halftime line. Chapman both gave him original lines and line changes; Wood accepted Chapman's lines and used them by giving them to Avarello to disseminate to bettors. This indicates more than a casual transmission of line information. *See United States v. McCoy,* 539 F.2d at 1061–62. Moreover, during the nine days of wagering activity intercepted, Wood laid off to Chapman four halftime bets totalling approximately $6,000. The nature of the bets cannot seriously be questioned. Wood referred to specific bets he earlier received when offering them to Chapman, and he, on one occasion, told Bowers that he had given Chapman $20,000 of bets he booked. Both Wood and Chapman described placing these bets as "laying." Because of the specialized nature of halftime wagering and because that type of action will arise only on those televised games not yet one-sided or otherwise unattractive to bets on the second half, we believe that the number of halftime layoffs Wood made during this brief surveillance takes on added significance. Not all bookmakers accept halftime wagers, but it is apparent from listening to the tapes that both Wood and Chapman did. It is also plain to us that Chapman was a source for Wood's layoffs when the latter's halftime book became unbalanced. Most important, the two men discussed a bottom figure, or sum owed by one party to a betting transaction to the other, in excess of $20,000. This is substantial evidence that the relationship between the men was an ongoing and continuous one and that the recorded layoffs were not merely casual or isolated. Moreover, our careful listening to the tenor of the conversations convinces us that the men dealt with each other on a regular basis whenever halftime bets were being played. Therefore, because the evidence supports the conclusion that Wood and Chapman regularly exchanged halftime line information and that Chapman regularly accepted halftime layoffs from Wood, we hold that Chapman was properly convicted as a participant in Wood's gambling business.

Government evidence established that James Avery was a bookmaker who operated in Amarillo. Witnesses testified that they placed wagers with Avery and paid him ten percent "juice" on losing wagers. The jury was played recordings in which Avery, after receiving line information from Wood, placed six wagers totalling more than $8,000. On one occasion, after placing a $2,000 bet on Arkansas, Avery offered to get Wood $1,000 to $2,000 more in wagers from "the guy that's got all the business here" because Wood told him his book was unbalanced on that game.

The FBI expert characterized Avery's bets as layoff bets, and Avery challenges this characterization. We have consistently upheld the use of expert testimony to explain the unique nature of the gambling business and to evaluate the evidence within the expertise of the witness. *United States v. Clements, supra; United States v. Masson, supra; United States v. Milton, supra; United States v. McCoy, supra; United States v. Alfonso, supra.* Although the expert's opinion with respect to the definition of a layoff bet was overbroad,[21]

---

**21.** The expert testified that he believed any bet between bookmakers who accepted the same type wagering activity to be a layoff. The definition used by this circuit restricts layoff

the jury was properly instructed both as to the weight to be given expert testimony and as to this circuit's definition of a layoff bet. The jury heard the tapes, and it was its function to evaluate the expert's testimony and other evidence. The trial judge repeatedly characterized the expert's testimony as only his opinion, admonished the jury to give no unusual deference to expert testimony, and carefully instructed them concerning the necessary factual conditions for linking one bookmaker to another. Adequate protection was given against the danger that the expert's opinion would be accepted as a legal conclusion. *See United States v. Milton,* 555 F.2d at 1203–05; *United States v. McCoy,* 539 F.2d at 1062–63. *See also, United States v. Guzek,* 527 F.2d 552, 559 (8th Cir. 1975).

■ Avery further contends that even if the bets were layoffs, the evidence was still insufficient to link him to the Dallas gambling business. His complaint is that there was no showing that he regularly placed layoff bets with Wood or that his bets substantially affected Wood's business. Although the issue is close, we believe the evidence supports the jury's conclusion that Avery regularly participated in the Dallas business. Wood supplied Avery with line information, and Avery placed layoff bets with Wood; the fact that there was no technical exchange of each is no bar to combining the two bookmakers. *United States v. Clements, supra.* The intercepted conversations allowed the jury to infer reasonably that the two men depended on each other on a regular basis. Avery mentioned a settle-up figure in excess of $7,000, which was in Wood's favor; this belies Avery's contention that the transactions with Wood were merely casual or isolated. Moreover,

the tenor of the conversations themselves suggests that the two men dealt with each other with regularity. They discussed their respective businesses in considerable detail and exchanged various items of gambling information.[22] Avery persistently offered to direct another bookmaker's bets to Wood to help him balance his book on a particular game. Although Avery's eight calls to Wood during nine days of wagering activity (and six bets in a three-day period) does not seem to us to be merely isolated contact, the jury's consideration of the relationship between bookmakers is not limited, as Avery would have it, merely to counting the number of conversations. The taped conversations were admitted into evidence, and the jury was entitled to draw reasonable inferences from the totality of the circumstances revealed by the calls. The language and terminology used, the attitudes of the speakers toward each other and toward their relationship, their apparent knowledge of the other's operation, a willingness to confer and to advise each other on business matters, and a willingness to carry the other's substantial debt as an account are indicia of a systematic and continuous interdependence. We have carefully listened to the tapes and agree that the evidence justifies a conclusion that there was an established business relationship between Wood and Avery and that their activity could be considered regular. Because a bookmaker who regularly places layoff bets with a gambling business is properly linked to that business, we affirm Avery's conviction as a participant in Wood's gambling business. *United States v. Clements, supra. See United States v. Grezo,* 566 F.2d 854, 857–60 (2d Cir. 1977).

We have considered the remaining contentions advanced by appellants and, find-

---

bets to those bets placed by bookmakers for the purpose of ridding themselves of excess wagering to achieve a balanced book. *E. g., United States v. Box,* 530 F.2d at 1261–62. The jury was given a detailed and thorough instruction to this effect.

**22.** For example, Avery called Wood to inform him that a particular game had been taken off

the board. The expert testified that this information would enable Wood to cease taking wagers on this game, as other bookmakers had, *to prevent his becoming out of balance on the game with no opportunity to lay off.*

ing them to be without merit, we reject them. Accordingly, the convictions of all appellants are

AFFIRMED.