**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Allen Joseph BOURG, Anthony P. Glorioso, Alphonse F. Iachino, Harry Duvigneaud, Sr., and Hillary D. Thibodeaux, Defendants-Appellants.**

No. 78–5038.

United States Court of Appeals,
Fifth Circuit.

July 9, 1979.

Julian R. Murray, Jr., New Orleans, La., for Bourg.

Robert F. Fleming, Jr., New Orleans, La., for Duvigneaud and Iachino.

Anthony L. Glorioso, New Orleans, La., pro se.

John J. McGuckin, Jr., Gretna, La., for Thibodeaux.

Ernest C. Chen, Robert J. Boitmann, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before GEWIN, GEE and RUBIN, Circuit Judges.

GEE, Circuit Judge:

This is another in an ever-growing number of gambling cases in this circuit, prosecuted pursuant to 18 U.S.C. § 1955.[1] Here, as in the other cases, a court-ordered telephone wiretap and testimony of FBI expert witnesses, who analyzed and interpreted the intercepted calls, formed the bulk of the government's case.

Pursuant to a court order, the FBI began monitoring and tape recording the telephone conversations of Allen "Pookie" Bourg, which were conducted over two telephones subscribed to by him. The wiretap, in effect from November 19, 1976, to December 2, 1976, intercepted 2,095 conversations and resulted in indictments against the appellants in this case—Bourg, Harry Duvigneaud, Anthony P. Glorioso, Alphonse F. Iachino, and Hillary Thibodeaux—and twelve others. The indictments charged conspiracy to violate 18 U.S.C. § 1955 and substantive gambling offenses. After a jury trial,[2] the government obtained convictions against nine defendants.[3] As we shall discuss below, we find that appellants' convictions must be reversed. This disposition makes unnecessary discussion of many alleged errors raised by appellants.

## The Facts

"Pookie" Bourg was an admitted bookmaker who operated out of a small attic room in his Harvey, Louisiana, residence. Government evidence established that the tapped telephones were installed in this room and were used by Bourg to conduct his bookmaking operation. Selected recorded conversations were played at trial, and FBI experts explained the significance of each call in the context of illegal gambling. This evidence tended to show that Duvigneaud, Iachino, and Glorioso were bookmakers who placed layoff bets with Bourg, often after receiving line information from him. The tapes also tended to show that Thibodeaux was one of a network of "writers" employed by Bourg to accept and relay wagers from bettors to him and to collect from and pay off Bourg's customers. Various other defendants not involved in this appeal performed other functions for Bourg's business, and it was the government's theory that Duvigneaud, Iachino, and Glorioso could be linked to the Bourg operation as well.

1. The statute provides in relevant part:
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 (b) As used in this section—
 (1) "illegal gambling business" means a gambling business which—
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 (2) "gambling" includes but is not limited to pool-selling, book-making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

2. Melvin Danos, Alvin Hughes, and Lea Hughes pleaded guilty to the conspiracy count and the substantive count was dismissed as to each.

The indictment was dismissed as to Louis Rachal in return for his cooperation and testimony and also was dismissed as to Pat B. Warren, who died prior to trial. Samuel Capielano was granted an indefinite continuance because of his ill health, and his case is still pending.

3. Bourg was convicted of conspiracy (count 1) and a substantive gambling offense (count 2) but was acquitted of another substantive violation alleged in count 3. Duvigneaud and Glorioso were found guilty of conspiracy and the substantive offense charged in count 2. Count 3 was dismissed as to them during trial. Iachino was found guilty of the count 2 substantive offense but was acquitted of conspiracy. Count 3 was also dismissed as to him during trial. Thibodeaux was found guilty of both conspiracy and the count 2 substantive offense; he was not charged in count 3. John Poche was convicted of conspiracy and the count 2 gambling offense but was found not guilty of count 3. Dominick Cardenal and Hubert Daigle were convicted of counts 1 and 2; neither was charged in count 3. Elmo Pecot was found guilty of count 2 but not guilty of conspiracy. Darryl Bourg and Caesar Longo were acquitted on all counts in which they were charged.

*The Jurisdictional Five*

 The initial challenge to the convictions at issue is raised by appellants Bourg and Thibodeaux; they contend that the government failed to prove that Bourg's gambling operation involved five or more persons as required by section 1955. This contention is wholly without merit. Even without considering any of Bourg's co-appellants, the jurisdictional five-person requirement was easily satisfied.[4] By his own admission, Bourg was the central figure of the business, and Melvin Danos worked closely with him as a telephone clerk, answering the phones and accepting wagers when Bourg was unavailable. Two government witnesses, Barbara Guillot and Louis Rachal, testified that they relayed the bets of others to the Bourg business. Mrs. Guillot was an independent bookmaker who handled only horse race betting; as a service to her customers and as a means to keep them placing horse bets with her, she accepted their football and basketball bets and gave them all to Bourg. Using the name "Sarah," she made daily phone calls to Pookie Bourg, often passing him thousands of dollars of wagers in a single call. Rachal distributed football cards and collected for Bourg, and in return for his services, he and his family were allowed to play the cards free against his commission. The tapes revealed that John Poche was also relaying the bets of others, and in one recorded conversation he and Bourg discussed his commission.[5] In addition, Andrew Areaux testified that he furnished the basketball line to Bourg. Plainly, the jury had ample evidence from which to conclude that

five or more persons were involved in the operation.[6]

*Sufficiency of the Evidence*

[3] Each appellant, except Bourg, contends that the evidence was insufficient to convict him of conducting Bourg's illegal gambling business. We note at the outset that, although each appellant unsuccessfully moved for a judgment of acquittal after the government closed its case, the motions were not renewed at the conclusion of all the evidence. Thus, our review of the evidence is limited to a determination whether to affirm the convictions would result in "a manifest miscarriage of justice." *United States v. Dawson*, 576 F.2d 656 (5th Cir. 1978); *United States v. Juarez*, 566 F.2d 511 (5th Cir. 1978).

 No miscarriage of justice would result if the convictions of Thibodeaux, Duvigneaud and Glorioso were affirmed. The government's theory was that Hillary Thibodeaux was a writer for Bourg's business, and it introduced taped calls in which a man who identified himself as "Hillary" telephoned Bourg and placed numerous wagers, some of which were self defeating. The FBI expert testified that self-defeating wagers are inconsistent with the activity of a "mere bettor" and concluded that Thibodeaux was a writer—one who relays the bets of customers to the central recording location. Prosecution of Duvigneaud and Glorioso was based on the theory that they could be linked to Bourg's business because they were bookmakers who regularly placed layoff bets[7] with him. The tapes revealed

---

4. We must, of course, review the evidence in the light most favorable to the verdict. *E. g., Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Ragano*, 520 F.2d 1191 (5th Cir. 1975).

5. Bourg rather emphatically told Poche never to use that word over the telephone again.

6. The scope of section 1955 is broad and excludes only customers of the business. *E. g., United States v. Avarello*, 592 F.2d 1339 (5th Cir. 1979). The jurisdictional five persons may include unnamed and unindicted persons as well. *United States v. Boyd*, 566 F.2d 929 (5th

Cir. 1978) (unnamed line source could be included as one of the jurisdictional five).

7. A layoff bet is the principal method by which a bookmaker balances his book. When his customers bet more on one side of the line than the other, the bookie will seek to "lay off" the excess by placing a bet in that amount with another person. Bookmakers strive to achieve the ideal situation—the same amount bet on each side of the line. The result of a perfectly balanced book is that the bookmaker collects 110% (the amount bet plus 10% "juice" or profit) of what is paid out, no matter which team wins.

that both Duvigneaud and Glorioso referred to specific wagers they gave to Bourg as layoffs, that Bourg gave line information to each of them on several occasions, that the men discussed "bottom figures" or money owed as a result of wagering, that the men discussed the ups and downs of their respective gambling businesses, that Duvigneaud provided Bourg with line information, and that Duvigneaud and Glorioso placed several bets each with Bourg. The FBI expert characterized these bets as layoffs. Although the evidence against these three appellants is not overwhelming, we think it sufficient for the jury to conclude with reason that Thibodeaux was a writer for Bourg, *United States v. Avarello*, 592 F.2d 1339 (5th Cir. 1979); *United States v. Masson*, 582 F.2d 961 (5th Cir. 1978); *United States v. Milton*, 555 F.2d 1198 (5th Cir. 1977), and that Duvigneaud and Glorioso maintained a continuous and regular business relationship [8] with Bourg by laying off bets and receiving line information, *United States v. Avarello, supra; United States v. Clements*, 588 F.2d 1030 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979).

▉ By any standard of review, the conviction of Alphonse Iachino must be reversed. The government sought to prove that he, too, was an independent bookmaker who regularly placed layoff wagers with Pookie Bourg. The government evidence, however, even when construed in the light most favorable to the verdict, established only that Iachino shared one telephone call to Bourg with Glorioso, warned Bourg that federal warrants were out, and placed one layoff bet in the amount of $550. This simply does not satisfy our requirement that the businesses be interdependent.[9]

The scope of section 1955 is broad, but we will not allow it to be . used to ensnare bookmakers who have only casual or isolated contact with their fellow bookmakers.

### Prosecutorial Misconduct

▉ Although we find the evidence sufficient to convict them, the convictions of Bourg, Thibodeaux, Duvigneaud and Glorioso must be reversed and their cases remanded for a new trial. This disposition is necessitated by the trial conduct of the prosecutor—conduct that was at best merely unprofessional and at worst uncontrollable and highly prejudicial to the defense. We would, perhaps, be convinced by the government's argument on appeal that the prosecutor's unnecessary and improper conduct was harmless error if the misconduct were confined to a few isolated instances over the course of the seven-day trial. This is not the case, however; the record is filled with examples of behavior inappropriate for an officer of the court. We could not possibly detail in this brief opinion all of the incidents in which the Assistant United States Attorney overstepped the bounds of fairness. It is enough to say that he continually interrupted and cut off defendants' counsel in their attempts to object and argue on behalf of their clients, he disobeyed clear admonitions from the bench, he ridiculed defense counsels' objections and implied that their efforts to protect their clients' rights were frivolous, he made insulting remarks to opposing counsel, and he was arrogant and impertinent in his conduct toward all other participants in the trial, including the trial judge. At one point Judge Mitchell apologized to Bourg's counsel for the prosecutor's deportment,

---

**8.** Appellants Duvigneaud and Glorioso contend vigorously that their convictions must be reversed because Bourg placed no layoff bets with them. As we said in *United States v. Clements*, 588 F.2d 1030 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979), the exchange of line information and layoff betting discussed in our cases does not have to be a technical one. When one gambler regularly gives line information to another gambler who regularly places layoff bets with

him, the two businesses may be linked for purposes of sec. 1955. *See generally United States v. Avarello, supra.*

**9.** At trial the theory apparently was that Iachino was Glorioso's partner and thus could also be linked to Bourg through Glorioso's layoff betting. One shared telephone call does not, in our opinion, prove a partnership in gambling, even when an FBI expert and an Assistant United States Attorney say that it does.

saying, "I tried to control him, but I can't very well do it." The judge then reprimanded the prosecutor and said, "I'm astounded sometimes at some of the things you do." So are we.

■ We cannot say that this mischievous behavior did not affect the jury verdict. The conduct apparently was designed to convey the impression that the prosecutor, and not the court, was in control of the case and that he, and only he, could interpret the evidence for the jury. Any attempt by defendants to contest the government's theory was met by scorn and derision. The evidence in this gambling case, as is likely true in most gambling cases, was close. Professional gamblers conduct their businesses with an abundance of caution. Convictions turn on whether the jury can reasonably infer that particular bets are more than mere bets and whether wagering activity exhibited over the course of a two-week wiretap can be considered substantial and regular. There are subtle distinctions to be made and many inferences to be drawn. Professional gamblers rarely identify themselves or their employees, either by name or by role, during the intercepted conversations, and the jury in this type of case has an extremely delicate task to perform. The prejudice created by the persistent misconduct shown in this record was magnified by the nature of the case and the difficulty of the questions involved.

■ It should be unnecessary to say again that in a criminal prosecution a United States Attorney has a double burden: he has the obligation to prosecute the government's case zealously and the obligation to try the case fairly and with due regard for the rights of the persons accused.[10] We are unimpressed, in the face of conduct designed to demean defense counsel and their legitimate efforts to present such defenses as they had, by arguments that the sufficiency of the evidence cured the misconduct. We realize that a trial is not a tea party, and we do not decry zeal, but its manifestations here far exceeded the permissible. We may not disregard such conduct as unprejudicial.

This disposition of the case makes it unnecessary to consider the other alleged errors. The conviction of Alphonse Iachino is REVERSED. The convictions of the other appellants are REVERSED and REMANDED for a new trial.

REVERSED in part, REVERSED and REMANDED in part.

10. *Berger v. United States*, 295 U.S. 76, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).