UNITED STATES of America, Plaintiff-Appellee,

v.

Eugene Andrew Anthony ALGIE, Defendant-Appellant.

No. 82–5368.

United States Court of Appeals, Sixth Circuit.

Argued June 23, 1983.

Decided Nov. 10, 1983.

Rehearing Denied Jan. 13, 1984.

Richard Slukich, Covington, Ky., for defendant-appellant.

Ronald E. Meredith, U.S. Atty., Alexander Taft, Richard A. Dennis, Louis Fischer (argued), Asst. U.S. Attys., Louisville, Ky., for plaintiff-appellee.

Before ENGEL and KRUPANSKY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

PER CURIAM.

Defendant-appellant Eugene Algie appeals from a denial by the trial court to suppress evidence obtained as a result of the issuance of a search warrant. Algie was tried by the court on May 10, 1982 and was found guilty on both counts of an indictment charging that he operated an illegal gambling business in violation of 18 U.S.C. Sec. 1955, and participated in an illegal conspiracy in violation of 18 U.S.C. Sec. 371. We reverse.

Algie was one of eleven defendants indicted by a federal grand jury on December 19, 1979. The indictment followed an investigation by the Federal Bureau of Investigation (FBI) which had commenced in the spring of 1977. The FBI's investigation concerned a network of gambling activities in the Northern Kentucky and Southern Ohio area. The FBI learned of bookmaking operations, conducted by Al Zenni, Dan Weyer and Richard Musk, which were headquartered in a Cincinnati, Ohio apartment. Special Agent Harold S. Harrison, Jr. of the FBI applied to the United States Magistrate for the Southern District of Ohio for the authorized use of a pen register to record numbers called on the apartment's two phones.[1] Harrison, in his affidavit, indicated his belief that "the specific telephone numbers called by the participants in furtherance of the alleged offenses would be obtained by monitoring the telephone dial mechanisms" of the telephones in the apartment. During the twelve day period that the pen register was operating (May 19, 1979 to May 30, 1979), fifteen calls were placed to telephone number 431–3912, registered to Highland Security Corporation.

Thereafter, Harrison filed an affidavit for a search warrant, incorporating the previously filed affidavit in support of the application for the pen register. The affidavit included numerous paragraphs detailing the illegal gambling operation in Cincinnati and revealed that telephone calls from the apartment where the gambling operation took place were made to Highland Security Corporation in Covington, Kentucky. In addition, Harrison indicated his belief that the apartment's two telephones were being used to make "lay-off" bets.[2] On June 12, 1979, a search warrant was issued to search Highland Security Corporation. During the search, federal officials seized a variety of gambling paraphernalia which led to appellant's indictment. Prior to trial, appellant moved to suppress the evidence obtained as a result of the search of Highland Security Corporation. The district court denied appellant's motion on March

---

1. The telephone numbers (513) 471–1708 and (513) 471–0595 were subscribed to in the name of Richard Musk, Apartment 41, 2500 Warsaw Avenue, Cincinnati, Ohio.

2. A "lay-off" bet simply enables a gambling operation to lessen the risk of loss by betting with other gamblers. E.g., United States v. Clerkley, 556 F.2d 709 (4th Cir.1977).

18, 1980, and denied appellant's motion to reconsider on April 21, 1980. Both parties agree that the sole issue preserved for appeal is whether the facts and circumstances contained in the affidavit are sufficient to uphold the search of Highland Security Corporation.

Probable cause to conduct a search exists when the facts and circumstances described in the affidavit indicate a "fair probability" that evidence of a crime will be located on the premises of the proposed search. *E.g., Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 2336, 76 L.Ed.2d 527 (1983); *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). In deciding whether there is probable cause to believe that contraband or evidence is located in a particular place, the "totality of the circumstances approach" should be used. *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). Affidavits in support of an application for a search warrant are to be reviewed by both courts and magistrates in a realistic and common sense fashion. *E.g., U.S. v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965). Moreover a magistrate's determination should be accorded great deference, and be disturbed only if arbitrarily exercised. *E.g., United States v. Swihart,* 554 F.2d 264, 267–268 (6th Cir. 1977); *United States v. Sevier,* 539 F.2d 599, 603 (6th Cir.1976). Consistent with these principles, we turn to appellant's arguments.

Appellant argues that the affidavit for the search warrant did not establish the credibility of the informants as constitutionally required and, furthermore, that the affidavit did not provide the reviewing magistrate with the underlying circumstances from which the informants drew their conclusions. We disagree. The information supplied by informants regarding appellant was based on direct observation by sources shown to have been reliable in the past. Informant information regarding the Cincinnati apartment was similarly obtained and corroborated by an affiant who made periodic spot checks of the premises. We hold that the informants' information was credible and reliable, as were the underlying circumstances of their conclusions. However, the informants' credibility is important only insofar as it establishes that the Cincinnati apartment was used in a gambling operation.

The issue is whether there was probable cause to search Highland Security Corporation, not the apartment at which illegal activities were known to be taking place. Nothing in the affidavit refers to informant information concerning Highland Security Corporation. The sole reference to Highland Security Corporation in the affidavit for the search warrant, which incorporates the affidavit for the pen register, indicates that from a phone in the Cincinnati apartment, the telephone number of Highland Security Corporation was dialed fifteen times between May 19, 1979 and May 30, 1979. Therefore, we must decide whether these fifteen telephone calls are sufficient to constitute probable cause to search Highland Security Corporation.[3]

---

**3.** The affidavit for search warrant indicates that ten telephone calls were made from the Cincinnati apartment to appellant's personal residence during the period that the pen register monitored the apartment's outgoing calls. The affidavit also contains information from two confidential informants; this information reveals that appellant was "conducting a large bookmaking operation" from three or four different locations. The information concerning appellant, however, is only relevant if there is a connection drawn between the appellant and Highland Security Corporation. A common sense reading of the affidavit in support of the search warrant fails to reveal any connection between appellant and Highland Security Corporation. The fact that the search of Highland Security Corporation revealed that appellant was its owner is inapposite. Although the government believes that the information obtained from the pen register is only a "part of the totality of the circumstances" reported in the affidavit for the search warrant, we believe that the pen register information is the only evidence that this court can properly consider in determining whether the magistrate's decision was arbitrary. *United States v. Martinez-Fuerte,* 428 U.S. 543, 565, 96 S.Ct. 3074, 3086, 49 L.Ed.2d 1116 (1976) (One reason for requiring a search warrant is to prevent hindsight from affecting a later evaluation of the

The government asserts that fifteen calls made to Highland Security Corporation from an apartment which authorities knew to be used for gambling, coupled with an affiant's belief that telephones are often used to make lay-off bets, constitutes sufficient evidence for a finding of probable cause. We disagree.

A pen register is a mechanical device which is usually installed at a "central telephone facility." *U.S. v. Giordano,* 416 U.S. 505, 549 n. 1, 94 S.Ct. 1820, 1842 n. 1, 40 L.Ed.2d 341 (1974) (opinion concurring in part and dissenting in part). The instrument records telephone numbers dialed by monitoring electronic impulses and causing perforation of a tape which indicates the number dialed, as well as the date and time.[4] *See United States v. New York Tel. Co.,* 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 366 n. 1, 54 L.Ed.2d 376 (1977) and *United States v. Terry,* 702 F.2d 299, 306 n. 5 (2nd Cir.1983). The device *"does not* overhear oral communications and *does not* indicate whether calls are actually completed." *United States v. New York Tel. Co.,* 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 366 n. 1, 54 L.Ed.2d 376 (1977). (Emphasis added).

Furthermore, a pen register does not indicate whether a receiving telephone was answered and, if it was, whether any conversation occurred. *United States v. Terry,* 702 F.2d 299, 306 (1983). Thus, the pen register in this instance could only reveal that someone in the Cincinnati apartment dialed Highland Security Corporation's telephone number fifteen times between May 19, 1979 and May 30, 1979. Although the Cincinnati apartment was a known location where illegal gambling took place, Highland Security Corporation was not; no demonstrable illegal activities were observed at Highland Security Corporation. In our view, the limited information obtained from the pen register in this instance is insufficient to convince a reasonably prudent person that contraband or evidence of a crime would be found on the premises. *See, e.g., United States v. Gray,* 659 F.2d 1296, 1300 (5th Cir.1981).

The only other possible source of probable cause is the affiant's assertion that telephones are commonly used to make lay-off bets.[5] Although bookmakers depend on the telephone to obtain and give out information, the affidavit does not indicate that

---

search.); *Stone v. Powell,* 428 U.S. 465, 473 n. 3, 96 S.Ct. 3037, 3042 n. 3, 49 L.Ed.2d 1067 (1976) (Police are not permitted to supplement information contained in the affidavit at a hearing on a motion to suppress.); *Whiteley v. Warden,* 401 U.S. 560, 564, 91 S.Ct. 1031, 1034, 28 L.Ed.2d 306 (1970) ("The decisions of this court concerning Fourth Amendment probable cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant.").

4. The dissent notes that "lay off bets are generally placed only once each day." Because the 15 calls from the Cincinnati apartment were made in a 12 day period, a ratio of approximately one call per day, the dissent concludes that the calls were probably lay off bets. In this regard, the dissent charges that we have failed to consider the *"modus operandi"* of the criminal activity involved and, thus, that we have failed to construe the affidavits in support of probable cause in a "common-sense" fashion. Although the dissent presents a logical theory, its premise that "lay off bets are generally placed only once each day" is without support. *See* Dissenting Opinion at p. 1046

("Pelle's Tax Service (4 calls); Eugene Algie (10 calls); Edward Kerkoff (3 calls); Pelle's Cafe (2 calls)"). In fact, neither the dates nor the times of the calls dialed from the Cincinnati apartment were included in the affidavits.

5. The dissent argues that the telephone is an "essential tool of the trade" and, thus, that the fifteen calls made from the Cincinnati apartment to Highland Security "assume heightened significance and render the recipient of the calls highly suspect." Further, the dissent asserts that because "lay off bets are generally placed only once each day, ... the magistrate was justified in concluding that 15 calls in a 12 day period warranted a suspicion that Highland ... was a bookmaking operation." We agree with the dissent that the calls from the Cincinnati apartment to Highland Security were sufficient to establish a *suspicion* that some unknown person was involved in a bookmaking operation. As the Supreme Court has indicated, however, mere suspicion that someone is involved in criminal activity is insufficient to establish probable cause to search. *E.g., Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1948).

every outgoing call from the Cincinnati apartment was of an illegal nature. Indeed, a common sense reading of the affidavit reveals that a number of phone calls from the Cincinnati apartment were made to locations with no discernible connection to gambling operations. There is no evidence, but only a business' "mere propinquity to others independently suspected of criminal activity," *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979). *See Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), to link Highland Security to the known gambling operation. In our view, the evidence raises only a mere suspicion that Highland Security Corporation was involved in illegal activities. Mere suspicion, however, is insufficient to establish any fair probability that contraband or other instrumentalities of crime would be found on the property of Highland Security Corporation. *See, e.g., Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1948); *United States v. Drake,* 673 F.2d 15, 18 (1st Cir.1982); *United States v. Green,* 670 F.2d 1148, 1151 (D.C.Cir.1981).

We emphasize the narrowness of our holding.[6] In this instance, the only factor before the magistrate was the fifteen telephone calls from the Cincinnati apartment to Highland Security Corporation. The inference that contraband or evidence of illegal operations can be found on every premises called by known bookmakers is not the sort of reasonable inference required to support an intrusion. We conclude that there was insufficient evidence to support a reasonable inference that contraband would be found on the premises of Highland Security Corporation. Consequently, we hold that the magistrate's decision to authorize a search of Highland Security Corporation was arbitrarily exercised.

Accordingly, the trial court's order is reversed.

---

**6.** We do not claim that information obtained through use of a pen register is irrelevant. We hold only that the pen register information, in

KRUPANSKY, Circuit Judge, dissenting.

The majority opinion, having elected to support its conclusion upon the isolated fact that "the only direct factor before the magistrate was the fifteen telephone calls from the Cincinnati apartment to Highland Security Corporation", to the exclusion of other implicating allegations of the affidavits construed in a "common sense" review of the "totality of the circumstances", *Illinois v. Gates,* —— U.S. ——, ——, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), prompts me to respectfully dissent.

The sole issue joined in this appeal is the sufficiency of the factual allegations of two affidavits to support a suspicion that there was a fair probability that gambling paraphernalia would be located on the premises of Highland Security Inc. (Highland) if a search was conducted upon issuance of a warrant. The controlling legal principles are settled. The Fourth Amendment to the United States Constitution demands that no warrant shall issue except upon probable cause:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"Probable cause" exists where there is a "*fair probability* that contraband or evidence of a crime will be found in a particular place." *Gates, supra,* —— U.S. at ——, 103 S.Ct. at 2332 (emphasis added). The quantum of "proof" necessary to support probable cause is less than the quantum traditionally required to satisfy the *prima facie* standard:

> As early as *Lock v. United States,* 7 Cranch. 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context, that "the term 'probable cause,' according to its usual acceptation,

light of the facts and circumstances of this case, is insufficient to support the magistrate's probable cause determination.

means less than evidence which would justify condemnation ... It imports a seizure made under circumstances which warrant suspicion." More recently, we said that "the *quanta* ... of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant [*Brinegar v. United States,* 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879 (1949)]. Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." [*Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)]. *Gates, supra,* —— U.S. at ——, 103 S.Ct. at 2330.

In determining whether probable cause exists, a magistrate is not bound by rigid legal principles. Rather, the circumstances must be viewed in their totality and with the application of common-sense:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates, supra,* —— U.S. at ——, 103 S.Ct. at 2332. Pertinently, judicial review of a magistrate's determination is extremely limited. The federal forum may not undertake a *de novo* review but, rather, must afford "great deference" to the magistrate's finding:

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the suffi-

ciency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts."

*Gates, supra,* —— U.S. at ——, 103 S.Ct. at 2331, citing *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). This requirement of deference mandates that "doubtful or marginal cases" be construed in accordance with the magistrate's initial determination. *Id.;* —— U.S. at —— n. 10, 103 S.Ct. at 2331 n. 10.

One factor pertinent to the magistrate's review of the "totality of the circumstances" is the *modus operandi* of the individual suspected of criminal activity or of the unique criminal conduct allegedly involved. In *Gates,* for example, petitioners were suspected of transporting controlled substances from Florida to Illinois on a routine basis. Law enforcement officials documented conduct which was "innocent" when casually viewed but which attained significantly heightened relevance when viewed within the context of the *modus operandi* of the crime.[1] *See also: Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

Confronting the action *sub judice,* it is initially observed that the allegedly offensive search warrant for Highland was supported by two affidavits, both authored by Harold Harrison, Special Agent of the Federal Bureau of Investigation. The first affidavit (Affidavit I), dated May 11, 1979, documented with particularized detail the existence of a large scale bookmaking enterprise operating from Apartment 41, 2500 Warsaw Avenue, Cincinnati, Ohio. Al Weyer (Weyer) and Dan Zenni (Zenni) were the ringleaders. Two telephones were utilized: 471–1708 and 471–0595 (Aff. I Par. 3d). Harrison attested, as an expert in gambling, that a successful gambling operation *required* a "laying off" of bets to achieve balanced books and assured profit.[2]

---

1. These otherwise innocent acts included defendant's flight to Florida from Illinois, an overnight stay at a hotel, followed by a return to Illinois via automobile.

2. "Laying off" characterizes the practice whereby a bookmaker has more money bet on a horse race or a sporting event than he desires and he transfers or hedges all or part of the bet to another bookmaker. *See: United States v.*

(Aff. I Par. 4b). He further represented that it was imperative for the successful bookmaker to receive accurate "line information".[3] (Aff. I Par. 4c) Telephones were used to lay off and receive the line.

Harrison attested further that a substantial volume of bookmaking activity was emanating from the Weyer-Zenni Warsaw apartment. Several confidential informants supplied the Cincinnati Police Department with information documenting the placement of bets at that location. (Aff. I Par. 5). The operation was connected to the Pennant Cafe, searched by the FBI in May of 1978, where gambling paraphernalia was seized. (Aff. I Par. 7). Robert Herbst, a small time bookie, accepted bets and called them in to a telephone number listed to Weyer. (Aff. I Par. 9–10). Zenni and Weyer jointly owned the D & A cafe (D & A), in Newport, Kentucky. The D & A was searched on December 13, 1978, and February 8, 1979, and on each occasion a quantity of bookmaking paraphernalia was seized. (Aff. I Par. 15 and 16). In May, 1979, bookmaking activity continued at the D & A; bets were being accepted there by Dick Musk.

Based on the probable cause supported by Affidavit I, a pen register was authorized to be placed on two telephones located at the Warsaw apartment utilized as the book headquarters by Weyer and Zenni.[4] Outgoing calls were monitored for a 12-day period commencing on May 19, 1979 and ending May 30, 1979. Special Agent Harrison submitted a second affidavit (Affidavit II) in support of the existence of probable cause to search several businesses and residences in the immediate geographical area of the Warsaw apartment. Affidavit II incorporated Affidavit I by reference, and further incorporated the pen register information which resulted from the warrant predicated upon Affidavit I. Harrison also attested to detailed and reliable information supplied by law enforcement officers and a myriad of confidential informants: [5]

Affidavit II unequivocally documented that 15 calls had been placed from the Weyer-Zenni operation on Warsaw Avenue to Highland located in northern Kentucky, during the 12-day period in which the pen register had been maintained (Aff. II Par. 3). The Weyer-Zenni's business hours at the Warsaw apartment were from 10:30 a.m. to 7:30 p.m.; very few calls were placed outside of those hours (Aff. II Par.

---

*Avarello,* 592 F.2d 1339 (5th Cir.), *cert. denied,* 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979). For example, the typical better or "player" bets $11 to win $10. The bookmaker retains the $11 if the better loses, and pays $21 if the better wins ($11 plus $10). The bookmaking operation would attempt to equalize or "balance" the number of bets on each side and insure a profit of the $1 "vigorish" or "juice". For example, suppose the bet concerned Team A v. Team B. If two bets were placed on Team A and two bets were placed on Team B, the book operation would take in $44 ($11 on four bets). Either Team A or Team B would win. The book would pay out $42 (the original two $11 bets and two $10 winnings) and receive a $2 profit irrespective of which team won. Axiomatically, the bookmaker's risk of loss decreases as the number of bets both for and against a particular team are equalized. In an attempt to balance the bets to minimize risk, bookmakers confer with one another and shift or "lay off" bets.

**3.** The "line" is the point spread or odds applied to the outcome of an athletic contest or horse race as between the contenders. A bookmak-

er's accurate calculation of the "line" permits him to insure a relatively "balanced book" through the normal wagering process.

**4.** The existence of probable cause to establish a pen register at the Warsaw Avenue apartment is not challenged in this appeal.

**5.** Representations of numerous confidential informations were incorporated in both affidavits. The reliability of each was expressly detailed. For example, CI–1 was qualified as follows:

On May 2, 1979, Officer Thomas H. Cornett, Cincinnati, Ohio Police Department, Vice Control Squad, advised me that he has been in sporadic contact during the past three years with a confidential informant hereinafter referred to as CI–1. CI–1 has provided Officer Cornett with reliable information much of which has been verified through independent investigation, during at least sixty contacts. CI–1 has been and is currently placing bets with Cincinnati, Ohio, bookmakers and is familiar with bookmaking procedures. Information provided by CI–1 has resulted in one conviction for prostitution.

4). The Weyer-Zenni operation, which was reportedly booking over $200,000 in bets a week (Aff. I Par. 5) had been in operation for an extended period of time, and was a highly successful enterprise. The operation was laying-off bets to someone, and was utilizing the telephone to do so. Telephone calls originating from a location suspected of harboring criminal activity may appear to be a relatively "innocent" acts. However, when, as here, the *modus operandi* of the crime relies upon the telephone as an essential tool of the trade, the existence of otherwise "innocent" calls assumes heightened significance and renders the recipient of the calls highly suspect. This is particularly true where, as here, the telephone calls were placed almost exclusively during the critical period of booking operation, *i.e.,* 10:30 a.m. and 7:30 p.m. each day.

Highland's location in northern Kentucky, well within the geographical boundaries of the Weyer-Zenni operation, also rendered it suspect. The second affidavit documented with particularized detail the existence of numerous businesses and personal residences in this same immediate geographical area which were undeniably implicated and intertwined with the Weyer-Zenni operation. For example, the D & A Cafe was obviously well implicated (Aff. I Par. 6–10); so was Pelle's Cafe (Aff. II Par. 13–16), Ivy & Bill's Cafe, Newport, Kentucky (Aff. II Par. 17–21), Pete's Food & Beverage, Cincinnati (Aff. II Par. 23), and the Edgemont Pony Keg.

It is pertinent to observe that the number of calls placed to Highland were approximately equal to or in *excess* of the number of calls placed to other business establishments and residences undeniably implicated in criminal activity and located in the immediate geographical area in issue. There is no doubt that probable cause existed to search these other establishments/residences, and yet all received approximately the same or fewer number of telephone calls from the book headquarters than did Highland. The D & A Cafe, owned and operated by the ringleaders Weyer and Zenni, received only 16 calls during the 12 day period (Aff. II Par. 5); *see also:* Pelle's Tax

Service (4 calls); Eugene Algie (10 calls); Edward Kerkhoff (3 calls); Pelle's Cafe (2 calls); Edgemont Pony Keg (15 calls), etc. (*Id.*) The number of calls to Highland were comparable to the number of calls placed to the other well documented illegal establishments, thereby rendering the telephone calls to Highland extremely suspect. Also, since lay-off bets are generally placed only once each day, when the bookmakers have determined with certainty the necessity of balancing their books, the magistrate was justified in concluding that 15 calls within a 12 day period warranted a suspicion that Highland, like the other involved businesses and residences, was a booking operation. The two affidavits, when reviewed within the "totality of the circumstances" in a "common-sense" manner, *Gates, supra,* —— U.S. at ——, 103 S.Ct. at 2332, support the magistrate's determination that there was a fair probability that evidence of contraband would be located at Highland. I would therefore affirm the district court's Order refusing to suppress the evidence confiscated at Highland.