NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0517n.06

Nos. 15-5859, 15-6300

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 02, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| JOE JENKINS (15-5859); JUANZELL JENKINS | ) | DISTRICT OF TENNESSEE |
| (15-6300), | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: GILMAN, WHITE, and STRANCH, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Brothers Joe and Juanzell Jenkins (Defendants) pleaded guilty of conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 841 and 846, pursuant to conditional plea agreements that preserved the right to appeal the district court's denial of their motions to suppress wiretap evidence. They received statutory mandatory minimum sentences of 60 and 120 months of imprisonment, respectively. On appeal, they argue that the wiretaps (1) were not supported by probable cause, and (2) did not comply with Title III of the Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-351, 82 Stat. 212 (June 19, 1968) (codified as amended at 18 U.S.C. § 2510 *et seq.*). We **AFFIRM** the denial of the motions to suppress.

## I. Background

These appeals arise out of a federal taskforce investigation into narcotics trafficking in Chattanooga, Tennessee, that began in 2009. During the investigation, the government sought

and obtained Title III authorization to place wiretaps on several phones connected to Juanzell,[1] a suspected distributor of crack and cocaine. Three of these wiretaps—placed on "target telephones" designated TT4, TT5, and TT8—are at issue in these appeals.

The government first applied for a wiretap on TT4, Juanzell's cell phone, and sought authorization to intercept Juanzell's communications with three others in May 2012. The application was based on the affidavit of James Hixson, a member of the Chattanooga Police Department assigned to the task force, who provided an account of evidence that Juanzell and the named interceptees were conspiring to distribute cocaine. This evidence included information from confidential informants, physical surveillance, controlled drug purchases, and analyses of call records from TT4 and other phones. Juanzell's brother Joe was not named as an interceptee, but was discussed and referred to as a subject in Hixson's affidavit, given the frequent interactions between the brothers. As required by Title III, Hixson also attested to the need for the wiretap as compared to other investigative methods, asserting that the wiretap was necessary to ascertain the scope of Juanzell's distribution organization in Chattanooga. Lastly, Hixson explained how the government planned to minimize the interception of non-pertinent calls, another Title III requirement. The district court authorized a thirty-day wiretap.

In February 2013, the government applied for a wiretap on TT5. In the supporting affidavit, Hixson explained that Juanzell had stopped using TT4 in favor of TT5 shortly after the TT4 wiretap ended. Although the TT4 wiretap had yielded evidence of a conspiracy, a regional cocaine shortage had prevented investigators from learning the depth of the coconspirators' involvement. Thus, the application sought authorization to intercept Juanzell's communications with Joe and four others on TT5. According to Hixson's affidavit in support of the TT5 wiretap,

---

[1] Because Defendants share a surname, we use their first names for clarity.

Joe was named as an interceptee in part because the TT4 wiretap had intercepted 67 calls between the brothers that revealed Joe's active role in Juanzell's operation. Hixson again attested to evidence supporting probable cause for the wiretap and asserted that another wiretap was the only available means of identifying the scope of Juanzell's operation, including the identities of their suspected sources in Atlanta, Georgia. The affidavit also included an explanation of the investigators' planned efforts at minimization. The district court signed an order authorizing a thirty-day wiretap.

Lastly, the government applied for a wiretap on TT8 in April 2013, shortly after the TT5 wiretap authorization had expired. Investigators believed TT8 was used by Robert North, an associate of Juanzell, and sought authorization to intercept North's communications with Juanzell, and two others, not including Joe. Hixson attested to evidence—from the previous wiretaps, call data, and confidential sources—that North supplied Juanzell with cocaine. Further, Hixson asserted that wiretap interception was necessary because there was still no other technique with a reasonable likelihood of success to identify the entire Chattanooga operation. The district court signed a wiretap order.

In October 2013, a grand jury issued a first superseding indictment charging both Defendants and over a dozen others with conspiracy to manufacture and distribute crack and powder cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. Juanzell was also charged with seven counts of distributing crack or cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Joe moved to suppress wiretap evidence from TT4, TT5, and TT8. Juanzell filed a separate motion to suppress and later incorporated Joe's arguments by reference. After a two-day hearing on Joe's motion, at which Hixson testified, the magistrate judge issued a report recommending denial. The district court overruled Joe's objections, adopted the report and

recommendation, and denied the motion. The district court later denied Juanzell's motion as well, relying on the reasoning supporting its denial of Joe's motion.

Defendants then entered into conditional plea agreements that preserved their right to appeal the denials of their motions to suppress. Joe pleaded guilty of conspiring to distribute at least 500 grams of cocaine, and Juanzell pleaded guilty of conspiring to distribute at least 5 kilograms of cocaine. The district court sentenced Joe and Juanzell to the statutory mandatory minimums of 60 and 120 months of imprisonment, respectively. We consolidated Defendants' timely appeals.

## II. Discussion

Defendants argue that the wiretap applications were not supported by probable cause, that the wiretaps were not necessary to the investigation, and that non-pertinent communications were not properly minimized. We review the district court's findings of fact for clear error and questions of law de novo. *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007). Defendants bear the burden of production and persuasion where, as here, they seek to suppress wiretap evidence, and we view the facts in the light most favorable to the government. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003); *United States v. Giacalone*, 853 F.2d 470, 482 (6th Cir. 1988); *see also United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014). When considering whether authorization of a wiretap was proper, we "will accord great deference to the determinations of the issuing judge." *United States v. Corrado*, 227 F.3d 528, 529 (6th Cir. 2000).

### A. Probable cause

"The basic standards for a wiretap are similar to those for a search warrant," and "the question that must be decided in issuing a warrant is whether there is probable cause to believe that evidence of a crime will be uncovered." *United States v. Alfano*, 838 F.2d 158, 161–62 (6th

Cir. 1988); *see also Giacalone*, 853 F.2d at 478. "Certainty is not required, but rather a fair probability and something more than mere suspicion." *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011). That a "reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Alfano*, 838 F.2d at 162. The issuing judge's probable-cause determination "will not be reversed if the record contains a 'substantial basis for his probable cause findings.'" *Id.* (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985)).

Here, Hixson's affidavits established probable cause to believe that all three wiretaps would lead to evidence that Juanzell and his associates had entered a conspiracy to distribute crack and cocaine. In the 70-page TT4 affidavit, Hixson explained that Juanzell initially became a target of the investigation in August 2009, after confidential informant CS-1—who had been assisting with an investigation of a different target—witnessed Juanzell engage in a drug transaction, corroborated by audio and video evidence. Investigators then interviewed a second informant, CS-2, about Juanzell, and learned that Juanzell had been selling cocaine to CS-2 on a weekly basis. A third informant, CS-3, assisted investigators in conducting four controlled buys from Juanzell between June and August 2011 and recorded Juanzell arranging sales on a phone designated TT1.

Juanzell later reduced his usage of TT1, and investigators analyzed call records from TT1 with the goal of identifying Juanzell's other phone numbers. Investigators identified TT1's two most frequent contacts, then checked the call records of those two phones, which shared only two mutual contacts—TT1 and a phone that investigators designated TT2. Investigators suspected that Juanzell was also using TT2, so they obtained TT2's call data and learned that

TT2 was being used to contact numbers with Atlanta area codes. CS-2 had earlier told investigators that Juanzell's source was in Atlanta.

Investigators also subpoenaed Juanzell's utility company to obtain his contact information and discovered a new phone, TT3. A fourth informant, CS-4, then conducted a controlled purchase of crack cocaine from Juanzell, and investigators confirmed that CS-4 had spoken with Juanzell on TT3. In March 2012, investigators again contacted CS-3, who said that Juanzell had been boasting about his cocaine business, so they enlisted CS-3 to conduct a controlled buy. CS-3 approached Juanzell, who provided a new number, TT4. CS-3 recorded Juanzell discussing a potential deal on TT4 and then conducted the controlled buy.

Investigators obtained a court order for TT4 call data from March through April 2012. Hixson attested that the call data revealed a pattern of call activity consistent with drug trafficking, including numerous contacts with prepaid phones that yielded no personal identifiers. Investigators also learned that Juanzell was in frequent contact with three known drug traffickers—Gerald Toney, Jimmy Bush, and David Weaver—and concluded that they were close associates of Juanzell. According to the affidavit, all three had criminal records and had been involved in the distribution of crack and cocaine: police sources named Toney as a "significant distributor of cocaine" in Chattanooga; proffers or interviews with federal defendants and dealers identified Bush as another significant distributor; and cooperating defendants and confidential sources similarly named Weaver as a distributor. R. 525, PID 1815. The wiretap application named all three—as well as Juanzell—as interceptees.

The TT5 and TT8 affidavits built on these facts with information intercepted from TT4. In the TT5 affidavit, Hixson explained that Juanzell had stopped using TT4, but that investigators identified TT5 as his new number through subpoena records and call data. Hixson

then detailed a number of pertinent calls intercepted on the TT4 wiretap that, along with analysis of call data, established a distribution operation, including contacts with Joe and the other TT5 named interceptees—Toney, Robert North, Clifford Simpson, and Sh'kayla Watkins. Notably, Hixson asserted that the TT4 intercepts established that Simpson was a "source of supply for cocaine and marijuana" for Juanzell, and the affidavit included the transcript of a call between Juanzell and Simpson discussing the availability of cocaine. *Id.* at PID 1916. Hixson also learned from Atlanta law enforcement that Simpson had been investigated for large-scale distribution. The TT8 affidavit, which targeted North, followed a similar pattern. North had been incarcerated during the TT4 wiretap, but the TT5 intercepts and TT8 call data indicated that North was "a source of supply" for Juanzell. *Id.* at PID 1985. The other named interceptees— Kenyatta Jasper and Torrey Gilmore—were similarly tied to the alleged cocaine distribution conspiracy through call data and the TT5 intercepts.

Thus, the facts alleged in each affidavit establish probable cause to believe that a wiretap would uncover evidence of a conspiracy to distribute crack and cocaine. Defendants urge a different conclusion, arguing that the court should disregard much of the evidence in the affidavits supporting probable cause for a conspiracy. According to Defendants, the controlled buys attested to in the TT4 affidavit support probable cause for a distribution offense by Juanzell, but not a conspiracy, and the only evidence of a conspiracy were the call data from TT4. Defendants then rely on *United States v. Algie*, 721 F.2d 1039, 1042 (6th Cir. 1983) (per curiam), where the court concluded that call data were inadequate evidence of probable cause. Thus, Defendants argue, without the evidence of Juanzell's individual distribution activities and the call data, the TT4 affidavit did not establish probable cause.

We consider the totality of the circumstances when evaluating probable cause. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). Here, the controlled buys clearly support the conclusion that Juanzell was engaged in drug trafficking, and the TT4 affidavit provides further support for the theory that his distribution activities were part of a larger operation. According to Hixson, Juanzell made a significant number of calls to prepaid phones, changed his own phone number several times, frequently contacted other known traffickers, and reportedly sourced cocaine from Atlanta. *Cf. Alfano*, 838 F.2d at 162. True, Hixson testified at the suppression hearing that Weaver, Toney, and Bush were named in the TT4 affidavit based only on investigators "identifying their numbers and having knowledge of their criminal activities," and that investigators "had no evidence linking them to [Juanzell] Jenkins, outside of the phone calls." R. 652, PID 3816. However, *Algie* does not require courts to disregard call data when evaluating probable cause. In *Algie*, we concluded that contacts between a gambling establishment and a business with no known connection to gambling, standing alone, did not establish probable cause. 721 F.2d at 1042. Here, in contrast, the call data showed that Juanzell was in contact with other drug traffickers, supporting the conclusion that Juanzell's cocaine distribution was not a solitary endeavor.

Defendants also suggest that factual misrepresentations in the affidavits undermine the probable-cause determination. Most significantly, Defendants point to Hixson's assertion in the TT4 affidavit that Juanzell engaged in a transaction involving North, who was later the target of the TT8 wiretap, in August 2009. Hixson testified at the suppression hearing that he identified North through a surveillance photograph, but by the time of the hearing he knew "without a doubt" that it was Jonathan Winters, not North, who had been involved in that transaction. R. 652, PID 3740–41. When preparing the affidavit, Hixson had compared the surveillance

photograph to photographs of Juanzell's known associates and incorrectly concluded that the man most resembled North. In retrospect, Hixson testified, he "should have left it as 'unidentified black male' and not even worried with it, because it had no—it had no bearing on the probable cause." *Id* at PID 3742.

The magistrate judge considered this issue in his report, concluding that Hixson had not exhibited "reckless disregard" as to the veracity of the affidavit, *see United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002), and that the misidentification did not deprive the investigation of probable cause to pursue a wiretap. R. 650, PID 3663. As the magistrate judge explained, North's name can be excised from the affidavit with no effect on the probable-cause determination, and even without the statement about this August 2009 transaction, "there remains sufficient content in the affidavit to support a finding of probable cause." *Stewart*, 306 F.3d at 305 (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).

Lastly, Juanzell contends that the affidavits do not establish "present probable cause" to support a wiretap. This argument originates in *Berger v. New York*, 388 U.S. 41 (1967), where the Supreme Court held that a broad eavesdropping law violated the Fourth Amendment. The Supreme Court specifically disapproved the practice of extending an eavesdropping order solely on the ground that an extension would be "in the public interest," concluding that "a showing of present probable cause for the continuance of the eavesdrop" was necessary. *Id.* at 59. Juanzell's reliance on this case is misplaced. Here, the government did not seek continuance of any of the three wiretaps; rather, after the TT4 wiretap concluded, the government filed a separate affidavit with new evidence from the TT4 intercept to support the TT5 application, and the same is true of the TT8 application. Each affidavit independently established probable cause to believe that a wiretap would uncover evidence of a conspiracy.

B. **Necessity**

Under Title III, the wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," and the court may authorize interception only after a determination that this standard has been met. 18 U.S.C. § 2518(1)(c), (3)(c). This requirement "protects against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation." *Rice*, 478 F.3d at 710 (alteration in original) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). However, investigators need only "give serious consideration to the non-wiretap techniques prior to applying for wiretap authority," and explain to the court "the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Giacalone*, 853 F.2d at 480 (quoting *Alfano*, 838 F.2d at 163–64)). "[T]he purpose of the necessity requirement 'is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" *Corrado*, 227 F.3d at 539 (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)). Thus, "a district court's finding that the requirements of § 2518(1)(c) have been met are afforded 'considerable discretion.'" *Stewart*, 306 F.3d at 304 (quoting *Landmesser*, 553 F.2d at 20)).

Here, we conclude that Hixson's affidavits sufficiently described the available methods of investigation and demonstrated that each method, having been duly considered, was either unsuccessful or too risky. In the TT4 affidavit, Hixson explained that Atlanta had become a "primary cocaine source city" for southeast Tennessee and asserted that a wiretap was the "only available mechanism" that was reasonably likely to identify Juanzell's organization in

Chattanooga and its suspected source in Atlanta. R. 525, PID 1855–56. According to Hixson, traditional methods had been unsuccessful in obtaining this information. For example, although physical surveillance on "numerous occasions" had yielded important information about vehicles and residences, these efforts were limited by Juanzell's "skill[] in counter surveillance techniques," including evasive driving. *Id*. at PID 1858-59. Physical observation in neighborhoods populated by Juanzell's friends and associates jeopardized the investigation. Further, investigators could not directly observe transactions taking place in homes and apartments, which could be corroborated only by informants or electronic surveillance.

Numerous confidential informants had been useful in gaining intelligence and executing controlled purchases, but had limited success in obtaining information about the scope of Juanzell's organization, having "never held a position of trust." *Id.* at PID 1865. Hixson noted that the targets of the investigation were alert to detection, as seen in Juanzell's routine use of counter surveillance. Hixson also favorably cited the investigation's success with phone records, but asserted that these records were of limited value without knowing the identities of the parties or the substance of the call. Other methods were considered but not attempted. For example, grand jury subpoenas, interviews, search warrants, and trash pulls were deemed unlikely to yield useful information, likely to compromise the investigation, or both. Hixson suggested that undercover infiltration might have been a possibility, but there were no cooperating witnesses in a position to introduce an undercover agent to Juanzell, who was "cautious and untrusting" in any event. *Id.* at PID 1864. Lastly, Hixson could not assess the effectiveness of a pole camera, but observed that use of a camera would suffer from some of the same difficulties as physical surveillance, and could alert Juanzell to the investigation.

The TT5 and TT8 affidavits mirror these observations and concerns. In the TT5 affidavit, Hixson explained that the TT4 wiretap had not been sufficient to identify the scope of Juanzell's organization because of the regional cocaine drought. Although the TT4 intercepts had revealed Simpson as an Atlanta source, Hixson reasoned that a wiretap was still necessary to confirm Juanzell's distribution network in Chattanooga, as well as any other sources. Hixson's description of the alternative methods was similar to the TT4 affidavit, but also described new challenges. For example, the TT4 intercept revealed that Toney, one of Juanzell's associates, would assist in conducting counter surveillance while Juanzell obtained cocaine from Simpson, which frustrated physical surveillance of the conspiracy. Further, Juanzell had employed additional means of evading surveillance, including using an alias to set up utilities at his residence. Similarly, Hixson attested in the TT8 affidavit that investigators had limited success in conducting physical surveillance on North and Jasper, who had been identified through earlier intercepts, despite extensive efforts—in part because of evasive actions. And although investigators had developed informants with access to Juanzell, the task force had not been unable to identify cooperating individuals who could develop relationships with North or introduce undercover officers.

The information in these affidavits is sufficient to satisfy § 2518(1)(c). *Cf. Poulsen*, 655 F.3d at 504. Defendants argue that the wiretaps were not necessary because investigators already had probable cause to arrest Juanzell for distribution. This argument is misplaced. Investigators sought the TT4 wiretap to obtain evidence about Juanzell's organization and sources, not his own distribution of cocaine. As Hixson stated in the affidavit: "While controlled purchases of cocaine and cocaine base from [Juanzell] JENKINS himself subject him

to prosecution, in affiant's opinion, only the interception of communications over TT4 will further the investigation" into the conspiracy. R. 525, PID 1857.

Defendants also suggest that investigators could have arrested Juanzell based on the intercepts from the TT4 wiretap, obviating the need for the TT5 and TT8 wiretaps, but this argument fails for the same reason. Although information collected from the TT4 intercepts helped establish probable cause to arrest Juanzell and others for conspiracy, Hixson explained in the TT5 affidavit that the TT4 intercepts had not yet established the scope of the conspiracy because of the cocaine shortage, and further wiretaps were the only method with a reasonable likelihood of success in accomplishing this goal.

Defendants also assert that investigators were required to pursue traditional methods of investigation into the activities of all named interceptees in each wiretap application. Defendants note, for example, that the TT4 affidavit addressed necessity only with respect to Juanzell, who used TT4, and not with respect to Toney, Bush, and Weaver. However, the TT4 affidavit explained that the government sought a wiretap on Juanzell's phone specifically to determine whether Juanzell—not Toney, Bush, and Weaver—was engaged in a conspiracy and to identify unknown members of any such conspiracy, including Juanzell's Atlanta source; to that end, the affidavit documented the investigation into Juanzell's activities and explained the necessity of a wiretap to support that investigation. Further, Defendants point to no authority holding that the government is required to exhaust traditional methods of investigation into all possible members of a conspiracy before applying for a wiretap.

Defendants next contend that traditional investigative methods like controlled buys and interviews had already been successful, and suggest that investigators did not make sufficient efforts to continue developing evidence through these tactics before applying for the TT4

wiretap. This argument again conflates Juanzell's own distribution activities with those of the suspected conspiracy. Although alternative investigative methods were successful in developing evidence of Juanzell's own distribution, as Hixson attested, the investigation into the conspiracy had not yielded similarly positive results. In any event, "the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart*, 306 F.3d at 305. Where, as here, "the telephone is routinely relied on to conduct the criminal enterprise under investigation," a wiretap "is particularly appropriate." *Landmesser*, 553 F.2d at 20 (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975)).

Defendants also contend that the affidavits' assertions of necessity are conclusory and boilerplate. They note that certain sections of the affidavits—for example, the section addressing grand-jury subpoenas—are very similar, and offer little specific information relevant to each particular application. But Hixson's assessment of the potential use of grand-jury subpoenas in the accompanying affidavit notes two significant hindrances: (1) any coconspirators would invoke the Fifth Amendment, and (2) it "would only serve to alert other members of this organization to the existence of the investigation." R. 525, PID 1944. The discussion of other methods challenged by Defendants similarly addressed why the relevant alternative was unsuccessful or dangerous. The affidavits sufficiently explained why the relevant application met the § 2518(1)(c) requirement, as investigators seriously considered non-wiretap alternative and determined them to be inadequate in the given circumstances. *See Rice*, 478 F.3d at 710 (reasoning that Title III does not require the government to "prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted") (quoting *Alfano*, 838 F.3d at 163).

-14-

Along these lines, Defendants also contend that the district court's orders failed to adequately explain the basis for its conclusion that the wiretaps were necessary; Defendants suggest that the district court did not read the affidavits "for comprehension" before signing the order. But absent evidence to support this claim, there is no basis for assuming that the district court did not review the affidavits thoroughly, and Defendants point to no authority requiring the district court to explain its conclusions about necessity in greater depth in an authorization order.

## C. Minimization

Lastly, Title III requires the government "to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140 (1978). We have explained that "the proper approach for evaluating compliance with the minimization requirement is to objectively assess the reasonableness of the monitoring agents' actions in light of the facts and circumstances confronting them at the time." *United States v. Feldman*, 606 F.2d 673, 677–78 (6th Cir. 1979). "It is not enough for the defendants to identify particular calls which they contend should not have been intercepted; they must establish a pattern of interception of innocent conversations which developed over the period of the wiretap." *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985) (quoting *United States v. Dorfman*, 542 F. Supp. 345, 391 (N.D. Ill.), *aff'd in part and rev'd in part on other grounds*, 690 F.2d 1217, 1230 (7th Cir. 1982)). Defendants must demonstrate "that the monitoring agents exhibited a high disregard for [their] privacy rights or that they did not do all they reasonably could to avoid unnecessary intrusions." *Feldman*, 606 F.2d at 679.

Here, the government's minimization efforts were documented in progress reports to the district court at the midpoint and conclusion of the thirty-day authorization. At the midpoint of the TT4 wiretap, the government reported intercepting 1399 completed calls, of which 265 were deemed pertinent and 15 were minimized. In the second half, investigators documented 1960 completed calls, of which 467 were deemed pertinent and 38 were minimized. The TT5 midpoint report documented interception of 915 completed calls, of which 371 were pertinent and 20 were minimized. The final report showed 1699 completed calls, of which 646 were pertinent and 38 were minimized. At the midpoint of the TT8 wiretap, the government reported interception of 758 completed calls on TT8, of which 184 were deemed relevant and 5 were minimized. The final report described a total of 287 pertinent calls and 12 minimized calls.

At the suppression hearing, Hixson explained the minimization procedures employed in the investigation. Investigators would listen to phone conversations for a period of time set by the case agent—he gave one minute as an example—and determine whether the conversation was pertinent to the investigation. A conversation was "non-pertinent" if it was "not drug related" or "not in any way related to the drug-trafficking activities of the target." R. 652, PID 3723. If the conversation was non-pertinent, investigators would stop recording for another set period of time—for example, 30 seconds—and then conduct a spot check to determine whether the conversation remained non-pertinent. Pertinent calls averaged 2 minutes and 14 seconds, whereas non-pertinent calls averaged 2 minutes and 6 seconds. Because the time runs from the moment the number is dialed, including while the phone is ringing, Hixson explained that the average call would be "about a minute and a half of conversation." *Id.* at PID 3726. He testified at the suppression hearing that investigators strictly complied with minimization requirements.

Defendants challenge the investigators' compliance with § 2518(5), pointing to the consistently small percentage of non-pertinent calls that were minimized. However, the Supreme Court has explained that "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer," noting that there are cases "where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable." *Scott*, 436 U.S. at 140. "The reasons for this may be many," the Court explained, including that non-pertinent calls "may have been very short," "may have been one-time only calls," or "may have been ambiguous in nature or apparently involved guarded or coded language." *Id.* Thus, we consider "the nature and scope of the criminal investigation; the Government's reasonable expectations of the character of conversations; and, the extent of judicial supervision over the surveillance." *Feldman*, 606 F.2d at 678.

Here, the task force investigated a potentially large-scale, interstate conspiracy to distribute cocaine. The Supreme Court has explained that, "when the investigation is focusing on what is thought to be a widespread conspiracy[,] more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott*, 436 U.S. at 140. Under these circumstances, "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Id.* at 142. Where calls are "ambiguous in nature," determining their relevance may be "virtually impossible until the completion." *Id.* Here, the object of the wiretap was to discover the identities of potentially unknown parties to a conspiracy, obscuring the relevance of short calls with unknown parties. Hixson also testified that Juanzell had used coded language during the calls; this would make it more difficult to determine whether a call was pertinent.

Additionally, Hixson testified that investigators calibrated their expectations for intercepted calls according to the identity of the other party to the call and previous contacts with the target. For example, Hixson testified that calls with parties who were clearly not coconspirators would "[a]bsolutely" be minimized quickly, but that the wiretaps frequently intercepted contacts between suspected coconspirators, R. 652, PID 3728, making minimization of short calls less likely even when a call was ultimately deemed not pertinent. Most of the calls, particularly on TT4, "were with the same individuals that there had been previous pertinent calls with" and "may have been monitored a little longer than the recommended time, based on who is making the phone call to the—to the target of the investigation." *Id.* at PID 3724–25. "If the target of the phone intercept has talked to a coconspirator a hundred times, and 100 of those phone calls have been pertinent phone calls," then investigators were more likely to monitor the call. *Id.* at PID 3727. Defendants object to investigators' alleged failure to minimize non-pertinent calls between the targets and Joe, but Joe was listed as a subject of the TT4 wiretap and a named interceptee of the TT5 wiretap. Under these circumstances, investigators were not unreasonable in monitoring calls between Joe and Juanzell, or between Joe and North.

Lastly, the district court supervised the surveillance through progress reports that included data about the minimization of intercepted communications, transcripts of selected calls, and a description of the progress of the investigation.

Viewing the facts in the light most favorable to the government, we conclude that Defendants have failed to carry their burden to demonstrate that the government did not comply with § 2518(5). *See Patel*, 579 F. App'x at 459. Notably, Defendants did not refute Hixson's testimony about investigators' compliance with the minimization requirement at the suppression hearing, and the magistrate judge considered Hixson credible for purposes of the motion.

Although investigators minimized only a small percentage of calls, other considerations support the conclusion that the investigators' actions satisfied the requirements of Title III.

**III.**

For these reasons, we **AFFIRM** the district court's denial of the motions to suppress.